[No. A116728. First Dist., Div. One. July 28, 2008.]

BRIAN KOPONEN et al., Plaintiffs and Appellants, v.
PACIFIC GAS & ELECTRIC COMPANY, Defendant and Respondent.

COUNSEL

Coughlin Stoia Geller Rudman & Robbins, Frank J. Janecek, Jr., Pamela M. Parker, Christopher Collins; Bushnell, Caplan & Fielding and Alan M. Caplan for Plaintiffs and Appellants.

Mark H. Penskar, Cesar V. Alegria, Jr.; Willenken, Wilson, Loh & Lieb, Nhan T. Vu, Jason H. Wilson and Paul J. Loh for Defendant and Respondent.

Lionel B. Wilson, Helen W. Yee and Carrie G. Pratt for California Public Utilities Commission as Amicus Curiae.

## OPINION

**STEIN, Acting P. J.**—Plaintiffs Brian Koponen, Gloria Peterson and The Edith A. Hayes Trust filed suit on behalf of themselves and a class of persons similarly situated against Pacific Gas & Electric Company (PG&E), a public utility, seeking damages and other relief after PG&E leased or licensed rights in easements burdening plaintiffs' property to telecommunications companies for the purposes of installing and using fiber-optic lines. PG&E demurred, contending (1) Public Utilities Code section 1759[1] deprived the superior court of jurisdiction to adjudicate plaintiffs' claims, (2) plaintiffs' claims cannot survive the decision in *Salvaty v. Falcon Cable Television* (1985) 165 Cal.App.3d 798 [212 Cal.Rptr. 31] (*Salvaty*) and (3) the case is not suitable for class adjudication. The trial court sustained PG&E's demurrer on the first of these grounds, ruling it had no jurisdiction over plaintiffs' claims. Having decided the matter on that point, the court did not rule on PG&E's other contentions, concluding they were mooted by its jurisdictional finding. The court then dismissed the complaint without leave to amend. We conclude section 1759 bars some but not all of plaintiffs' claims.

### BACKGROUND

According to plaintiffs' allegations, PG&E, by condemnation or private agreement, obtained easements creating rights-of-way over plaintiffs' properties for the purposes of furnishing and supplying electricity, light, heat and power to the public. Plaintiffs allege that at some time after 1990, PG&E began installing fiber-optic telecommunications lines and wireless telecommunications equipment in the corridors subject to the easements. PG&E later began leasing or licensing fiber-optic capacity and telecommunications services to third parties, including leading telecommunications and Internet

---

[1] Further statutory references are to the Public Utilities Code.

companies. Plaintiffs claim by leasing or licensing its facilities to telecommunications providers, PG&E exceeded the scope of the easements granted or conveyed to it and reduced the value of plaintiffs' properties. They assert the installation and leasing of fiber-optic lines has increased and will increase the burden on the servient estates by increasing maintenance activities along the easement corridors and by creating the possibility that the estates will be subject to 1996 amendments to the Pole Attachment Act, 47 United States Code section 224 et seq., which requires electric utility companies to grant telecommunications carriers nondiscriminatory access to poles and rights-of-way owned or controlled by the companies.[2] Plaintiffs also complain the leases and licenses subject plaintiffs to increased risks of tort liability by allowing third parties to use the easement corridors. Plaintiffs allege causes of action for unlawful business practices, unfair business practices, unjust enrichment, and intentional and negligent trespass. They seek compensatory and punitive damages; injunctive, declaratory and equitable relief; restitution, prejudgment and postjudgment interest and attorney fees.

DISCUSSION

**I.**

**Standard of Review**

"On appeal from a judgment dismissing an action after sustaining a demurrer without leave to amend . . . [t]he reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.]" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966–967 [9 Cal.Rptr.2d 92, 831 P.2d 317].)

**II.**

**Section 1759 Does Not Bar Plaintiffs' Suit**

*Limitations Imposed by Section 1759*

■ This case, like others before it, concerns the interplay between sections 1759 and 2106. Section 1759 recognizes the Public Utilities Commission

---

[2] Title 47 United States Code section 224(f)(1) provides, "A utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access to any pole, duct, conduit, or right-of-way owned or controlled by it."

(commission, or, sometimes, PUC) is an agency of constitutional origin with broad powers granted to it by the Constitution (Cal. Const., art. XII, §§ 1–6) and the Legislature through the plenary power granted to the Legislature by article XII, section 5 of the California Constitution. The Legislature, by means of the Public Utilities Act (§ 201 et seq.), has authorized the commission to "do all things, whether specifically designated in [the act] or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction [over public utilities]." (§ 701.) California Constitution article XII, section 5 further grants the Legislature plenary power to "establish the manner and scope of review of commission action in a court of record." The Legislature has not conferred authority on the superior courts to review commission decisions. Rather, review of most commission decisions may be obtained by filing a "petition for a writ of review in the court of appeal or the Supreme Court for the purpose of having the lawfulness of the original order or decision or of the order or decision on rehearing inquired into and determined." (§ 1756, subd. (a).)[3] Section 1759, subdivision (a) provides: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court." ■ The Legislature accordingly has made it clear "that no other court has jurisdiction either to review or suspend the commission's decisions or to enjoin or otherwise 'interfere' with the commission's performance of its duties." (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 916 [55 Cal.Rptr.2d 724, 920 P.2d 669] (*Covalt*).)[4]

■ Notwithstanding this limitation, chapter 11 of the Public Utilities Act, entitled "Violations," recognizes the superior courts have jurisdiction to redress violations of commission decisions committed by public agencies. (§ 2100 et seq.; *Covalt, supra,* 13 Cal.4th at p. 916.) Section 2106 creates a private remedy, providing, "Any public utility which does, causes to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission, shall be liable to the persons or corporations affected thereby for all loss, damages, or injury caused thereby or resulting therefrom. If the court finds that the act or omission was wilful, it may, in addition to the actual

---

[3] Certain decisions may be reviewed only by petition for writ of review in the Supreme Court. (See § 1756, subds. (f), (g).)

[4] At the time *Covalt, supra,* 13 Cal.4th 893, was decided, section 1759 limited jurisdiction to review commission decisions or orders to the Supreme Court. It was revised in 1996 to confer jurisdiction also on the Court of Appeal.

damages, award exemplary damages. An action to recover for such loss, damage, or injury may be brought in any court of competent jurisdiction by any corporation or person." The Supreme Court, recognizing a potential conflict between sections 2106 and 1759, has held section 2106 "must be construed as limited to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies." (*Waters v. Pacific Telephone Co.* (1974) 12 Cal.3d 1, 4 [114 Cal.Rptr. 753, 523 P.2d 1161] (*Waters*).) "[T]he two sections must be construed in a manner which harmonizes their language and avoids unnecessary conflict. Section 2106 reasonably may be interpreted as authorizing only those actions which would not interfere with or obstruct the commission in carrying out its own policies." (*Id.* at p. 11.)

█ "Under the *Waters* rule [*Waters, supra,* 12 Cal.3d 1], accordingly, an action for damages against a public utility pursuant to section 2106 is barred by section 1759 not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy." (*Covalt, supra,* 13 Cal.4th at p. 918.) █ The Supreme Court established a three-part test to determine whether an action is barred by section 1759: (1) whether the commission had the authority to adopt a regulatory policy; (2) whether the commission had exercised that authority; and (3) whether the superior court action would hinder or interfere with the commission's exercise of regulatory authority. (*Id.* at pp. 923, 926, 935; see *Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256, 266 [115 Cal.Rptr.2d 874, 38 P.3d 1098] (*Hartwell*).)

*Application of Three-part Test*

As the present case illustrates, the test may be somewhat easier to state than to apply. PG&E identifies a regulatory policy of promoting the joint use of utility property for general telecommunications purposes. PG&E then cites five commission opinions explaining the commission's reasons for granting applications by PG&E to enter into agreements with providers of telecommunications services. The opinions recognize that allowing PG&E to install, lease and/or license fiber optics on its transmission lines will benefit the public by encouraging energy utilities to use their property productively and by reducing the need for construction of new telecommunications project sites. In addition, at least some of the agreements provide additional benefit to the public by allowing PG&E to increase its capacities and obtain supporting facilities at minimal cost. Installing fiber-optic lines also would provide some additional stability to existing transmission lines. The commission also considered what PG&E should do with the revenues generated by

the licenses or leases, and concluded, for the most part, that the revenues should be credited to PG&E's ratepayers.[5]

We do not doubt the commission has power to regulate PG&E's use of its facilities, including the power to regulate whether PG&E may install fiber-optic lines or license or lease its facilities to providers of telecommunications services. We also do not doubt the commission, subject to state or federal statutory requirements, has the power to determine how revenues from

---

[5] In January 2000, the commission granted PG&E's application to permit Electric Lightwave, Inc., to install and use fiber-optic lines on PG&E's transmission towers and rights-of-way. In seeking approval, PG&E asserted, "The agreement allows PG&E to obtain expanded utility communications capacity with minimal investment and at low annual expense. . . . The fiber optic facilities on the transmission towers will function as a static wire that will give additional protection to transmission lines against lightning." In granting the application, the commission found, "Joint use of utility property should be encouraged in appropriate cases because of the obvious economic and environmental benefits."

In July 2002, the commission issued a decision granting, in part, PG&E's application for approval of two irrevocable license agreements with IP Networks, Inc., that would permit the provider to use utility support structures, optical fiber and equipment sites on PG&E property. The commission found, "The public interest is served when utility property is used for other productive purposes without interfering with the utility's operation or affecting service to utility customers. [¶] . . . [¶] PG&E's grant of the irrevocable licenses to IP Net will also serve the public interest by enabling PG&E to improve its internal utility communications and control systems and to thereby provide enhanced service to the public. In addition, in appropriate cases, the shared use of utility property by energy utilities and telecommunications providers results in both economic and environmental benefits, by encouraging energy utilities to use their property productively and reducing the need for construction of new telecommunications sites." The commission rejected a request by PG&E that it be allowed to split the revenues generated from the licenses between its ratepayers and its shareholders, ruling instead that revenues should be credited to ratepayers.

In May 2002, the commission granted an application for approval of an irrevocable license for Metromedia Fiber Network Services, Inc., to use fiber-optic cable on PG&E's facilities. The commission found, "the application serves the public interest by proposing joint use of utility facilities and minimizing duplicative infrastructure." Among other things, the opinion finds, "It is sensible for California's energy utilities, with their extensive easements, rights-of-way, and cable facilities, to cooperate in this manner with telecommunications utilities that are seeking to build an updated telecommunications network. Joint use of utility facilities has obvious economic and environmental benefits. The public interest is served when utility property is used for other productive purposes without interfering with the utility's operation or affecting service to utility customers." The commission again rejected PG&E's request to split net revenues 50/50 between ratepayers and shareholders, ruling PG&E should credit all revenue stemming from the agreement to the ratepayers.

In October 2004, the commission approved an irrevocable lease allowing WilTel Communications to install and use fiber-optic facilities on PG&E's electrical transmission towers, substations, and other facilities. The commission reiterated its previous findings of public benefit.

In September 2005, the commission authorized PG&E to enter into an irrevocable lease with Broadwing Communications Services permitting Broadwing to install and use fiber-optic facilities on PG&E's electric transmission towers, substations, rights-of-way and other facilities. The commission again recognized the public interest would be served by PG&E's cooperation with a telecommunications provider.

PG&E's leases or licenses must be allocated or distributed. There also is little question that the commission has exercised its regulatory power by authorizing PG&E to enter into specific licensing or leasing agreements and also by determining how resulting revenues will be allocated. We therefore agree plaintiffs' suit is barred to the extent it could hinder or interfere with the commission's exercise of its authority to determine what use PG&E can make of its facilities or how revenues generated from that use should be allocated.

Plaintiffs, however, contend their claims have nothing to do with the commission's authority to regulate PG&E's use of PG&E property, including PG&E's property interest in the rights-of-way over plaintiffs' land. Rather, plaintiffs seek to establish PG&E is invading *plaintiffs'* property rights by attempting to sell to the telecommunications providers a use of the rights-of-way that PG&E does not own. Plaintiffs contend the commission has no regulatory authority or interest in private disputes over property rights between PG&E and private landowners. We agree.

In *Covalt*, the plaintiffs filed an action seeking damages and injunctive relief from an electric company alleging injury and property damage from electric currents through power lines on an easement on land adjacent to the plaintiffs' residence. (*Covalt, supra*, 13 Cal.4th at p. 910.) According to the complaint, the currents caused " 'high and unreasonably dangerous levels of electromagnetic radiation [EMF's—for electromagnetic fields] [to be emitted] onto [the] plaintiffs' property.' " (*Id.* at p. 911.) The Supreme Court found the commission had authority to determine whether the service or equipment of any public utility poses a danger to the health or safety of the public, and, if so, to prescribe corrective measures and order them into effect. (*Id.* at pp. 923–924.) It also has broad authority over the design and siting of electric power lines. (*Id.* at pp. 924–925.) The commission, therefore, had the authority to adopt a policy on whether electric and magnetic fields arising from the power lines are a public health risk and what action, if any, the utilities should take to minimize that risk. (*Id.* at p. 923.) The commission had been investigating the potential public health effects of exposure to electromagnetic fields (EMF's), had issued reports on its findings and had developed and implemented rules based on its findings. The Supreme Court therefore found, "the commission has exercised—and is still exercising—its constitutional and statutory authority to adopt a general policy on whether electric and magnetic fields arising from the powerlines of regulated utilities are a public health risk and what steps, if any, the utilities should take to minimize that risk." (*Id.* at p. 935.)

Most of the plaintiffs' theories against the electric company were barred for reasons unrelated to the reach of section 1759. (*Covalt, supra*, 13 Cal.4th at

pp. 935–937, 939–943.) The Supreme Court, however, considered whether section 1759 deprived the superior court of jurisdiction to adjudicate the plaintiffs' claim of nuisance. The plaintiffs alleged their use and enjoyment of their property had been impaired by the fear that the EMF's would cause them physical harm. (13 Cal.4th at p. 939.) The court found that even if such a claim were viable, the trier of fact could award damages only by finding reasonable persons viewing the matter objectively would experience a substantial fear that the EMF's would cause physical harm and also that the invasion was so serious as to outweigh the social utility from the complained-of conduct. It held, "Such findings, however, would be inconsistent with the commission's conclusion, reached after consulting with [the State Department of Health Care Services], studying the reports of advisory groups and experts, and holding evidentiary hearings, that the available evidence does *not* support a reasonable belief that [the EMF's to which the plaintiffs had been exposed] present a substantial risk of physical harm, and that unless or until the evidence supports such a belief regulated utilities need take no action to reduce field levels from existing powerlines." (*Ibid.*)

In *Covalt, supra,* 13 Cal.4th 893, then, the plaintiffs by their court action sought a ruling directly contrary to a decision of the commission made in response to an issue actually and properly before it: the regulation of EMF's to protect the public safety. Similarly in *Waters, supra,* 12 Cal.3d 1, a suit against a telephone utility seeking damages for failing to provide adequate service was barred because the commission had adopted a policy of limiting the liability of telephone utilities. The Supreme Court held, "Since an award of substantial damages to plaintiff would be contrary to the policy adopted by the commission and would interfere with the commission's regulation of telephone utilities, we have concluded that section 1759 bars the instant action." (*Id.* at p. 4.) Here, in contrast, there is no evidence the commission has considered the extent of PG&E's property interests in its rights-of-way, or that it has adopted any policy limiting a utility's liability for invading the property interests of private parties.

The court in *Covalt, supra,* 13 Cal.4th 893, distinguished two appellate court cases. In *Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224 [18 Cal.Rptr.2d 308] (*Cellular Plus*), consumers and corporate sales agents, including Cellular Plus, brought suit against two cellular telephone service companies, claiming price fixing under the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.). (*Cellular Plus*, at p. 1229.) The trial court sustained demurrers to those claims, apparently finding they were barred by section 1759. (14 Cal.App.4th at p. 1231.) The companies asserted the demurrer properly had been granted because the trial court proceedings would interfere with the commission's overall primary jurisdiction over rates charged by public utilities. (*Id.* at p. 1246.) The appellate court disagreed. "We cannot conceive how a price fixing claim under the Cartwright Act could

'hinder or frustrate' the PUC's supervisory or regulatory policies. The only apparent policy of the PUC that could be affected is its regulation of rates charged by cellular telephone service providers. However, Cellular Plus does not dispute that the PUC has jurisdiction over rates, nor does it seek any relief requiring the PUC to change any rates it has approved. Cellular Plus is merely seeking treble damages and injunctive relief for alleged price fixing under the Cartwright Act." (*Ibid.*; and see *Covalt, supra*, at p. 919.) In addition, although not directly applicable to the companies' arguments about section 1759, the Court of Appeal recognized the PUC does not have jurisdiction over antitrust violations. (*Cellular Plus, supra*, at p. 1247.)

In *Stepak v. American Tel. & Tel. Co.* (1986) 186 Cal.App.3d 633 [231 Cal.Rptr. 37] (*Stepak*), a minority shareholder in a telephone utility filed a class action against the utility alleging breaches of fiduciary duty in connection with a proposed merger with a second utility. The commission later approved the merger. (*Id.* at pp. 636–638.) In finding section 1759 did not bar the shareholder's suit, the Court of Appeal reasoned, "We are aware of no 'declared supervisory and regulatory policies' [citation] ever formulated or relied on by the commission on the subject of safeguarding minority investor interests. Applying the *Waters* test of jurisdiction [*Waters, supra*, 12 Cal.3d 1], we cannot conceive of how the superior court's award of damages or other relief to wronged minority shareholders would 'hinder or frustrate' [citation] declared commission policy. Appellant's class action suit is therefore authorized under section 2106." (*Stepak, supra*, at pp. 640–641; and see *Covalt, supra*, 13 Cal.4th at pp. 919–920.) In addition, the court found the commission had "entered an area beyond its regulatory realm when it purported to adjudicate the 'fairness' of the transaction to minority shareholders, as distinct from the issue of whether retention of minority shareholders was in the public interest." (*Stepak*, at p. 641.)

In both *Cellular Plus, supra*, 14 Cal.App.4th 1224, and *Stepak, supra*, 186 Cal.App.3d 633, the commission had no legitimate regulatory interest in the claims underlying the plaintiffs' complaints. It had no authority to respond to antitrust claims and no authority to respond to claims a transaction would be unfair to minority shareholders. That the claims were brought against public utilities did not, in and of itself, invest the commission with regulatory authority over them, nor did it matter that the plaintiffs might have been entitled to relief for action that had been approved by the commission. Similarly here, the commission has no authority to determine the property dispute between plaintiffs and PG&E, and it does not matter that the commission has approved PG&E's applications. The commission certainly can determine that the applications are in the public interest, just as the commission in *Stepak* was entitled to determine that the merger was in the public interest, but neither that finding nor the commission's approval of the applications in any way determined the extent of PG&E's rights in the

easements. Moreover, even if the commission's decisions might be interpreted as finding PG&E's interest in the easements permitted PG&E to enter into the leases or licenses, PG&E has not established that the commission's regulatory authority actually allows it to adjudicate private property rights.

In *Cal. Water & Tel. Co. v. Public Util. Com.* (1959) 51 Cal.2d 478 [334 P.2d 887], the commission, in essence, determined that a contract, plus amendments thereto, between a utility and an individual, obligated the utility to dedicate services to portions of the individual's property. The commission then ordered the utility to carry out the terms of its agreement as modified by the commission's own opinion, directing the utility to reexecute the contract, as amended by agreement of the parties, and as modified by the commission's order. (*Id.* at pp. 487–488.) The Supreme Court reversed the commission's order, pointing out " 'the . . . commission is not a body charged with the enforcement of private contracts. [Citation.] Its function . . . is to regulate public utilities and compel the enforcement of their duties to the public [citation], not to compel them to carry out their contract obligations to individuals.' The commission cannot 'modify' a public utility's contract or order a public utility to perform a contract, whether 'modified' or 'unmodified.' It may, however, within the limits of its jurisdiction, order a public utility to render certain services on certain terms and conditions, and in so doing it is not bound by the terms of a utility's previously negotiated contracts.' " (*Id.* at p. 488, quoting *Atchison etc. Ry. Co. v. Railroad Com.* (1916) 173 Cal. 577, 582 [160 P. 828].) Similarly, the commission cannot "modify" the terms of the rights-of-way obtained by PG&E by eminent domain or private contract.

Our conclusion on this point is supported by the commission itself, which filed an amicus curiae brief at our request. The commission affirms it has established a policy favoring the joint use of utility property, including easements, and has authorized PG&E to lay fiber-optic cable alongside existing electrical lines and to share those fiber-optic cables with telecommunications providers. It explains, "Implicit in this authorization, however, is the assumption that PG&E in fact possesses the legal right to lay such cable alongside its electrical lines. That issue was not presented to the Commission for determination, and no such determination was made. It is important to note that, in the Commission decisions cited by PG&E, the Commission did not (and could not) authorize PG&E to do more than what is legally permitted under the scope of PG&E's existing easements."

*Section 1759 Bars Some of Plaintiffs' Claims*

That the commission has made no determination of the extent of PG&E's easements means only that plaintiffs are not barred from seeking a court

determination of that issue. It does not, however, follow that plaintiffs are entitled to obtain all the relief they seek by their complaint. To the contrary, some of the relief plaintiffs seek invades the commission's ratemaking authority, and is barred by section 1759.

The problem is illustrated and partially resolved by the opinion in *Hartwell, supra,* 27 Cal.4th 256. The plaintiffs there sought damages and injunctive relief on allegations, among others, that water companies regulated by the commission had provided contaminated well water to the plaintiffs, causing death, personal injury and property damage. (*Id.* at pp. 260–261.) The commission, exercising its regulatory authority, had adopted standards for water safety which it used as benchmarks in setting the rates the water companies could charge. (*Id.* at pp. 272, 276.) The court held the plaintiffs were not entitled to challenge the adequacy of water standards approved by the commission or seek damages on the theory the public utilities had provided unhealthy water despite meeting the standards. An award of damages on such theory would interfere with a broad and continuing supervisory program of the commission and would undermine the commission's policy by holding the utility liable for not doing what the commission repeatedly had determined it and all similarly situated utilities were not required to do. (*Id.* at p. 276.)

■ The plaintiffs could, however, pursue claims that a utility had failed to meet the water standards, because those claims would not interfere with the commission's regulatory policy requiring water utility compliance with those standards. (*Hartwell, supra,* 27 Cal.4th at p. 276.) "[S]uperior courts are not precluded from acting in aid of, rather than in derogation of, the PUC's jurisdiction. [Citation.]" (*Id.* at p. 275.) This was true even though the commission had made a retrospective finding that the water companies had substantially complied with drinking water standards for the past 25 years. The commission's factual finding was not part of an identifiable broad and continuing supervisory or regulatory program. (*Id.* at pp. 276–277.) In addition, while the commission had authority to redress past violations, the remedies it could order would be essentially prospective in nature. As the commission could not award damages for past failures to meet state and federal drinking standards, the plaintiffs' "damage actions would not interfere with the [commission] in implementing its supervisory and regulatory policies to prevent future harm." (*Id.* at p. 277.) Further, "the *Covalt* language regarding the contravention of an order was simply a reference to the statutory language in subdivision (a) of section 1759 that '[n]o court of this state, except the Supreme Court and the court of appeal . . . shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission . . . .' [Citation.] Although a jury award supported by a finding that a public water utility violated [State Department of Health Care Services] and PUC standards would be contrary to a single PUC decision, it would

not . . . constitute a direct review, reversal, correction, or annulment of the decision itself. Accordingly, such a jury verdict would not be barred by the statute." (*Hartwell,* at pp. 277–278, quoting *Covalt, supra,* 13 Cal.4th at p. 918.)

■ For the same reason, section 1759 presents no bar to plaintiffs' claim for damages incurred as a result of unauthorized uses of the rights-of-way. Any suggestion in a commission order that PG&E acted properly in leasing or licensing the use of its right-of way in a specific case is not part of an identifiable broad and continuing supervisory or regulatory program. An award of damages for past invasions of plaintiffs' property rights would not interfere with the commission's authority to implement supervisory or regulatory policies to prevent future harm. And finally, a finding PG&E was violating plaintiffs' property rights would not interfere with the PUC's declared policy of encouraging joint use of PG&E's facilities even if such finding would be contrary to or inconsistent with a PUC order, and would not constitute a review, reversal, correction, or annulment of the order itself.

Section 1759 also does not bar plaintiffs from seeking to enjoin PG&E from invading plaintiffs' property interests by licensing or leasing its facilities. It is true the Supreme Court ruled in *Hartwell* that a grant of injunctive relief would conflict with a decision made by the commission and would interfere with its regulatory function. In that case, however, the commission had investigated the plaintiffs' claims, had concluded they were unfounded, and effectively found no need to take any remedial action against the utilities. It followed that "[a] court injunction, predicated on a contrary finding of utility noncompliance, would clearly conflict with the PUC's decision and interfere with its regulatory functions in determining the need to establish prospective remedial programs." (*Hartwell, supra,* 27 Cal.4th at p. 278.) In the present case, the commission has made no investigation into the validity of plaintiffs' claims, has made no finding PG&E has complied with the terms of the grants of its rights-of-way, and has made no determination further action has been rendered unnecessary.

Plaintiffs, however, may not seek relief in the nature of "disgorgement of unjustly obtained profits" or restitutionary or declaratory or other relief requiring PG&E to pay to plaintiffs some or all of the revenues from leasing or licensing its facilities. The commission, as part of its ratemaking authority, has determined how those revenues are to be allocated. An award of relief that effectively redirects the payment of those revenues would directly contravene or annul the commission's decisions.

## CONCLUSION

The trial court erred in ruling that section 1759 deprived it of jurisdiction to consider all of plaintiffs' claims. Having found that some of those claims survive the bar of the section, we remand this matter to the superior court for further proceedings.

Swager, J., and Margulies, J., concurred.