Filed 1/20/15  Guerra v. San Diego Gas & Electric CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| MARC GUERRA, | D065265 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2012-00103728-CU-BT-CTL) |
| SAN DIEGO GAS & ELECTRIC COMPANY, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Reversed.

Blood Hurst & O'Reardon, Timothy G. Blood, Leslie E. Hurst; Law Office of John W. Davis and John W. Davis for Plaintiff and Appellant.

Perez & Wilson, Michael J. Perez and Jeffrey A. Feasby for Defendant and Respondent.

A tariff rule promulgated by the California Public Utilities Commission (PUC) provides San Diego Gas & Electric Company (SDG&E) can gain access to SDG&E's facilities located on a customer's private property and, when the customer has elected to

place SDG&E's facilities behind locked doors, the rule grants SDG&E the discretion to select the locking mechanism that must be installed by the customer to enable SDG&E's personnel to obtain access to those facilities. SDG&E selected the Schlage VTQP Quad Key Section system (Keyways) as the device its customers must install. Keyways is a lock and key system, and SDG&E creates and distributes the keys (and also authorizes other vendors to distribute keys), any one of which can open a wide range of the doors secured with Keyways. SDG&E does not track or secure the keys distributed by itself or others.

A substantial number of property crimes during 2011 and 2012 were perpetrated by criminals who used keys for Keyways to obtain access to otherwise secure buildings, including burglaries at a condominium building known as "Aperture," where plaintiff Marc Guerra resides. In 2012, Guerra filed this putative class action against SDG&E alleging a claim under California's Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq. (UCL)), which asserted, in part, that SDG&E engaged in unfair and unlawful business practices because it distributed keys to the locking mechanism selected by SDG&E without imposing reasonable controls to safeguard or track the keys, and Guerra and similarly situated persons were injured by SDG&E's conduct because persons obtained and used these keys to obtain entry to private property to commit burglaries. On the eve of Guerra's class certification motion, SDG&E sought judgment on the pleadings asserting, among other grounds, that the trial court did not have jurisdiction under Public

2

Utilities Code[1] section 1759.  The trial court agreed and granted the motion, and Guerra timely appealed.

I

FACTUAL AND PROCEDURAL BACKGROUND

A. The Tariff Rule

SDG&E is a public utility the operations of which are governed by various tariff rules adopted by the PUC, including SDG&E Rule 16 (Rule 16).  Rule 16 governs service extensions and covers numerous subjects, including granting SDG&E access to the customer's premises.  It specifies SDG&E "shall at all times have the right to enter and leave [the customer's] Premises for any purpose connected with the furnishing of electric service . . . and the exercise of any and all rights secured to it by law, or under utility's tariff schedules. These rights include, but are not limited to . . . [¶] . . . [t]he use of a utility-approved locking device, if Applicant desires to prevent unauthorized access to utility's facilities . . . ."  (Rule 16(A)(11)(a).)  Under this rule, if a property owner chooses to locate SDG&E facilities behind a locked gate or door, the property owner must pay for and install the locking device approved by SDG&E to ensure SDG&E can access its facilities.  SDG&E has chosen Keyways as the lock system customers must install.

---

[1]    All statutory references are to the Public Utilities Code unless otherwise specified.

B. <u>The Alleged Defalcations</u>

Guerra resides at the Aperture condominium complex in San Diego, California, which has Keyways. Burglars entered the Aperture complex on seven occasions in the 22 months preceding Guerra's complaint and were able to obtain access to the common areas by using a key to operate Keyways. Police estimate that a substantial portion of the burglaries occurring in San Diego's central division were perpetrated by criminals able to obtain access to buildings using SDG&E's Keyways. SDG&E told police it has no way of tracking the keys it issues and therefore could not assist police in investigating.

During discovery, SDG&E confirmed it does not know how many keys it has distributed, or who has the keys it issued. It does not require employees to report when a key has been lost or stolen, and will issue multiple keys to an individual employee on request. SDG&E also confirmed it permits numerous non-SDG&E vendors to obtain copies of the keys, thereby providing these vendors with access to the buildings; and although SDG&E is entitled to audit for the inventory and security of those keys, it has never done so. SDG&E does not know how many keys have been distributed to vendors and does not require vendors to report lost or stolen keys.

C. <u>The Lawsuit</u>

Guerra filed this putative class action against SDG&E alleging a claim under the UCL, asserting SDG&E engaged in unfair and unlawful business practices because it distributed keys to the locking mechanism it selected without instituting reasonable policies and procedures to track and safeguard the keys and access to Keyways, and asserting there were reasonable alternatives to provide SDG&E secure access for its

4

legitimate business purposes. Approximately one year later, Guerra filed his class certification motion.

In reply, SDG&E sought judgment on the pleadings, asserting (1) the trial court did not have jurisdiction under section 1759, (2) the court should abstain from exercising jurisdiction to avoid usurping the PUC's authority, and (3) SDG&E can have no liability for the injuries to Guerra and other similarly situated people because of intervening criminal conduct. SDG&E's argument under section 1759 asserted Guerra's UCL claim challenged SDG&E's *choice* of Keyways and that, because Rule 16(A)(11)(a) granted SDG&E the discretion to select the type of locking device its customers must use, an injunction against use of Keyways would interfere with the PUC's exercise of its regulatory authority (embodied in Rule 16(A)(11)) precluded pursuant to section 1759 under the test set forth in *San Diego Gas & Electric Co. v. Superior Court* (*Covalt*) (1996) 13 Cal.4th 893 (*Covalt*). Guerra opposed the motion for judgment on the pleadings, arguing the action did *not* seek to enjoin SDG&E from electing to use Keyways, but instead sought injunctive relief requiring SDG&E to take reasonable steps to exercise control over the keys it distributed for the device it selected as the locking mechanism.

The trial court agreed with SDG&E that section 1759 deprived the court of jurisdiction over a complaint challenging its choice, use and monitoring of Keyways, reasoning that the monitoring failures alleged by Guerra were part of the choice made by SDG&E (which choice was conferred on SDG&E by the PUC's tariff Rule 16(A)) to use

5

Keyways.  The court entered judgment on the pleadings in favor of SDG&E, and Guerra timely appealed.

## II

## LEGAL FRAMEWORK

The Public Utilities Act vests in the PUC the "broad authority to 'supervise and regulate every public utility in the State.' . . . "  (*Covalt, supra*, 13 Cal.4th at p. 915.)  This broad authority authorizes the PUC to " 'do all things, whether specifically designated in [the Public Utilities Act] or in addition thereto, which are necessary and convenient' in the exercise of its jurisdiction over public utilities."  (*Ibid*., italics omitted.)  PUC action is subject to judicial review, and section 1759 "prescribes a method of judicial review that is narrow in both 'manner and scope.' "  (*Id*. at p. 915.)  Among other provisions, section 1759, subdivision (a), provides that "[n]o court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court."

Although section 1759 proscribes trial courts from reviewing commission rules and decisions, the Legislature has provided a private right of action against utilities for unlawful activities and conduct that may be pursued in the trial courts.  Section 2106 provides for an action to recover for loss, damage, or injury "in any court of competent jurisdiction" by any corporation or person against "[a]ny public utility which does, causes

to be done, or permits any act, matter, or thing prohibited or declared unlawful, or which omits to do any act, matter, or thing required to be done, either by the Constitution, any law of this State, or any order or decision of the commission . . . ."  The tension between sections 1759 and 2106 has led numerous courts to recognize that "[i]t has never been the rule in California that the commission has *exclusive* jurisdiction over any and all matters having any reference to the regulation and supervision of public utilities."  (*Vila v. Tahoe Southside Water Utility* (1965) 233 Cal.App.2d 469, 477 [court has jurisdiction over complaint alleging utility wrongfully refused to provide water service that sought injunction to compel utility to provide water at prescribed rates and for damages]; accord, *Thrifty-Tel, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1571 [PUC does not have jurisdiction "over all matters that simply have some bearing upon regulated utilities"].)  Superior courts have concurrent jurisdiction to resolve a dispute between a private party and a utility, and to award injunctive relief where appropriate (*Truck Owners etc., Inc. v. Superior Court* (1924) 194 Cal. 146, 157-158; *Vila,* at p. 477) where the injunctive relief would act "in aid of, rather than in derogation of, the PUC's jurisdiction."  (*Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256, 275.)

Recognizing the tension between section 1759's limitations and section 2106's right of action, our Supreme Court "has held section 2106 'must be construed as limited to those situations in which an award of damages would not hinder or frustrate the commission's declared supervisory and regulatory policies.' "  (*Koponen v. Pacific Gas & Electric Co.* (2008) 165 Cal.App.4th 345, 351.)  In *Covalt*, the Supreme Court held "[u]nder the *Waters* [*v. Pacific Telephone Co.* (1974) 12 Cal.3d 1] rule, . . . an action for

7

damages against a public utility pursuant to section 2106 is barred by section 1759 not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would 'reverse, correct, or annul' that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would 'hinder' or 'frustrate' or 'interfere with' or 'obstruct' that policy." (*Covalt, supra*, 13 Cal.4th at p. 918, fn. omitted.) *Covalt* established a three-part test to determine whether an action is barred by section 1759: "(1) whether the commission had the authority to adopt a regulatory policy; (2) whether the commission had exercised that authority; and (3) whether the superior court action would hinder or interfere with the commission's exercise of regulatory authority." (*Koponen,* at p. 351.)

III

ANALYSIS

A. <u>The Trial Court Erred in Dismissing the Complaint under Section 1759</u>

Our analysis begins with the nature of the action brought and relief sought by plaintiff because section 1759 "is not intended to, and does not, immunize or insulate a public utility from any and all civil actions brought in superior court" (*People ex rel. Orloff v. Pacific Bell* (2003) 31 Cal.4th 1132, 1144), but instead deprives a superior court of jurisdiction to entertain an action only under the circumstances set forth in *Covalt*. Here, plaintiff's action alleged SDG&E engaged in unfair and unlawful business practices because it distributed keys to the locking mechanism selected by SDG&E without instituting reasonable policies and procedures to track and safeguard the keys and access

8

to Keyways even though there were reasonable alternatives that would provide secure access to SDG&E for its legitimate business purposes. Guerra sought to enjoin SDG&E from continuing to engage in the unfair and unlawful business practices.[2]

The first step under *Covalt* to whether an action is barred by section 1759 is whether the PUC has the authority to adopt a regulatory policy governing service extensions and access to property. SDG&E contends, and Guerra does not dispute, the PUC has the authority to adopt rules governing service extensions, including rules that require customers seeking service to enable SDG&E to have access to the customer's property to maintain the facilities. The parties do not dispute that Rule 16, which has "the force and effect of law" (*Dollar-A-Day Rent-A-Car Systems, Inc. v. Pacific Tel. & Tel. Co.* (1972) 26 Cal.App.3d 454, 457), was within the ambit of the power conferred on the PUC to review "the rules, practices, equipment, appliances, facilities, or service of any public utility" and to "prescribe rules for the performance of any service or the furnishing of any commodity of the character furnished or supplied by any public utility . . . ." (§ 761.)

---

[2]    Although the complaint was amenable to the interpretation that Guerra *also* sought to compel SDG&E to select a different locking mechanism other than Keyways, Guerra (in his response to SDG&E's motion for judgment on the pleadings) specifically eschewed any claim that his action sought anything other than to compel SDG&E to institute reasonable policies and procedures to track and safeguard the keys and access to Keyways. More importantly, because the court declined Guerra's request for leave to amend, we must presume the court ruled that section 1759 barred Guerra's action even had he amended the action to clarify that it sought only to compel SDG&E to institute reasonable policies and procedures to track and safeguard the keys and access to Keyways.

9

The remaining two questions under *Covalt* to decide whether the action is barred by section 1759, which are somewhat intertwined, are whether the PUC exercised its authority by actually adopting a policy governing the conduct of the utility that the present action challenges as unlawful, and whether a superior court judgment granting Guerra the requested relief would somehow hinder or interfere with the PUC's exercise of that regulatory authority. We conclude both of those questions must be answered in the negative.

The PUC has adopted a tariff rule to guarantee SDG&E has access to the owner's premises, and implemented that guarantee in part by permitting SDG&E to designate which type of locking device an applicant must install. However, the PUC imposed no regulatory requirements or standards governing how SDG&E is to safeguard the keys it distributes to operate the locks. SDG&E argues the fact Rule 16 is silent on how (or even whether) a utility is required to safeguard the keys is irrelevant to the analysis of the preclusive impact of section 1759 on Guerra's action, because SDG&E asserts cases like *Sarale v. Pacific Gas & Electric Co.* (2010) 189 Cal.App.4th 225 teach that the adoption of rules touching on a subject matter must be read broadly as encompassing all related subjects, and therefore a rule permitting SDG&E to select Keyways must be read broadly to encompass all aspects of SDG&E's administration of Keyways. In *Sarale*, the plaintiff landowners brought an action against the utility alleging the utility engaged in excessive trimming of commercially productive walnut trees located under the utility's power lines, and the trial court sustained the utility's demurrers without leave to amend and dismissed the complaints under section 1759. (*Sarale,* at p. 230.) A divided court concluded that

10

because the PUC had undertaken to study tree clearances around overhead power lines, and had thereafter adopted statewide standards for *minimum* tree clearances while also recognizing that " '[v]egetation management practices may make it advantageous to obtain greater clearances than those listed' " (*id*. at p. 239), the second part of the *Covalt* test had been satisfied because "it is quite apparent that the commission has exercised its jurisdiction to regulate tree trimming around power lines." (*Sarale,* at p. 239.) The *Sarale* majority concluded that, for purposes of evaluating whether a lawsuit seeking to challenge tree trimming beyond the minimum clearances was precluded by section 1759, the second part of the *Covalt* test had been satisfied, reasoning "it does not matter whether we characterize the commission's actions broadly, as addressing 'the management of vegetation near power lines,' or narrowly, as addressing 'minimum [tree] trimming clearances.' What matters is that the commission has exercised its authority to adopt a regulatory policy relating to tree trimming around power lines—regardless of how that policy may be characterized." (*Ibid*.)

SDG&E argues that, like in *Sarale*, the PUC has exercised its authority to adopt a regulatory policy regarding a utility's access to its facilities, and it does not matter whether the policy is characterized narrowly (as addressing only SDG&E's selection of the locking device) or more broadly (as encompassing the procedures for providing access to those locking devices). However, even assuming we agree with the *Sarale* court's analysis (but see *Mata v. Pacific Gas & Electric Co.* (2014) 224 Cal.App.4th 309, 319 [noting a "strong dissent" questioned how allowing the lawsuits to go forward would interfere with PUC's regulatory authority since neither plaintiff challenged any conduct

11

falling within the minimum clearances established by the PUC]), *Sarale* is of little assistance here because it considered a policy that had been extensively visited and revisited by the PUC over the decades (see *Sarale*, 189 Cal.App.4th at p. 242 [noting the "record in this case indicates that clearances for vegetation management surrounding power lines were revised by the commission in 1948, 1962, 1964, 1966, 1967, 1968, 1980, 1988, 1990, 1992, 1996, 1997, and 2005"], and hence represented the type of " 'broad and continuing supervisory or regulatory program' " (*Hartwell Corp. v. Superior Court, supra*, 27 Cal.4th at p. 276) *Covalt* determined would be protected from judicial interference.  In contrast, Rule 16 does not represent a "broad and continuing supervisory or regulatory program" regulating a utility's ability to obtain access to premises, much less concerning itself with the administrative details of how the utility should protect its authorized access against being misused by unauthorized persons, but instead is largely concerned with the terms and conditions under which a utility extends service to a home or business.  Rule 16 does include a subsection guaranteeing access to the customer's premises to permit the utility to provide a range of services, but the extent of that policy is the specification that the utility's access shall include (1) access for the utility's vehicles and equipment, (2) freedom from unrestrained animals, (3) use of a utility-approved locking device under certain circumstances, and (4) the right of access to the premises to remove the utility's equipment after termination of service.  (Rule 16, subds. (A)(11)(a)-(d).)

We agree with Guerra that Rule 16's brief advertence to use of a utility-approved locking device is not the type of broad and continuing supervisory or regulatory program

12

with which the second part of the *Covalt* test is concerned. As *Covalt* explained, "[w]hen the bar raised against a private damages action has been a ruling of the commission on a *single* matter such as its approval of a tariff or a merger, the courts have tended to hold that the action would *not* 'hinder' a 'policy' of the commission within the meaning of *Waters* and hence may proceed. But when the relief sought would have interfered with a broad and continuing supervisory or regulatory program of the commission, the courts have found such a hindrance and barred the action under section 1759." (*Covalt, supra*, 13 Cal.4th at pp. 918-919, italics added.) *Covalt* illustrated the distinction by citing two cases in which the second part of its test was not satisfied (*Id.* at pp. 919-920), and contrasting those cases with a pair of appellate court decisions in which the second part of its test was satisfied. (*Id.* at pp. 919-923.) Among the former cases was *Cellular Plus, Inc. v. Superior Court* (1993) 14 Cal.App.4th 1224 (*Cellular Plus*), in which a consumer's action alleging price fixing by two cellular telephone service companies was permitted to proceed even though the PUC had granted both defendant companies certificates of convenience and necessity authorizing them to operate and had approved the rates they proposed to charge. The defendant companies' demurrer on the ground that the commission has sole jurisdiction over rates charged was sustained, but the *Cellular Plus* court concluded the action could proceed, because the PUC had determined only that the proposed rates were reasonable, and the plaintiff's price-fixing claim did not challenge the economic reasonableness of the prices but only whether the prices were in fact artificially maintained. (*Cellular Plus,* at p. 1246.) The *Cellular Plus* court then concluded the action would not hinder or frustrate the PUC's supervisory or regulatory

13

policies, because "[t]he only apparent policy of the PUC that could be affected is its regulation of rates charged by cellular telephone service providers. However, [plaintiff] does not dispute that the PUC has jurisdiction over rates, nor does it seek any relief requiring the PUC to change any rates it has approved." (*Ibid.*)

In contrast, *Covalt* noted cases like *Brian T. v. Pacific Bell* (1989) 210 Cal.App.3d 894, in which the superior court action would have interfered with a broad and continuing policy of the commission and hence was barred by section 1759. In *Brian T.*, the PUC had addressed a problem arising because telephone utilities offered "information access services," which potentially could have been used to disseminate sexually explicit material to minors, and the PUC considered how to restrict access to adults only. The Federal Communications Commission (FCC) had considered three methods of achieving such a restriction (blocking devices on the customer's premises; blocking systems at the utility's central station; and "customer access codes" issued on request to adult subscribers) and ultimately adopted the third of these methods. However, the PUC investigated and adopted an interim decision approving the central-station method of blocking sexually explicit messages, and (after exhaustive hearings) reaffirmed its decision in favor of central-station blocking. (*Covalt, supra*, 13 Cal.4th at p. 920.) In a lawsuit by a minor's parents, who alleged the minor had listened to sexually explicit messages and then engaged in unlawful sexual contacts with another minor, the parents sought damages and a preliminary injunction to compel the phone company to make available to its customers screening or blocking devices. The *Brian T.* court upheld the trial court's order dismissing the action for lack of jurisdiction, reasoning the requested

14

injunctive relief would in effect call for PUC action to modify its previous decisions on how to restrict access, and such interference with a PUC policy was prohibited by section 1759. (See *Brian T.,* at pp. 900-901.)

Here, as in *Cellular Plus*, the bar raised against Guerra's action is a PUC approval of a single tariff rule, which is limited to allowing the utility to select the locking device that must be installed, not an explicit policy adopted after exhaustive studies as in *Brian T.* Here, as in *Cellular Plus* but unlike *Brian T.*, the relief sought by Guerra would neither require the PUC to change the tariff rule nor preclude SDG&E from selecting the locking device, but instead would only require that SDG&E adopt measures to guard against unauthorized use of the keys to that locking device. In *Cundiff v. GTE California Inc.* (2002) 101 Cal.App.4th 1395, the court applied *Covalt* to an analogous set of circumstances and found the action was not barred. In *Cundiff*, the plaintiff sued a phone company alleging the monthly bills sent to customers were false and misleading because the bills listed as "equipment rental" a monthly charge for renting the phone unit. (*Id*. at p. 1402.) The trial court sustained a demurrer without leave to amend on the ground that section 1759 gave the PUC exclusive jurisdiction. The *Cundiff* court reversed and held the suit was not barred by section 1759, reasoning that even if "the *amount* of money defendants charged each month as rent for telephones was approved by the commission, we do not perceive the thrust of plaintiffs' complaint to be a challenge to that amount. Nor do we perceive this as a suit challenging the commission's decision to allow defendants to rent telephones to their customers. Rather, plaintiffs are challenging the *manner* in which defendants billed them for rental of telephones, specifically, the alleged

lack of information given to plaintiffs about the rental charge made each month by defendants." (*Id*. at p. 1406.) Similarly, Guerra is not challenging the PUC's decision to allow SDG&E to *select* which locking device to install, but is instead challenging only the *manner* in which SDG&E chooses to administer the system, and the manner in which SDG&E chooses to safeguard the keys.

SDG&E argues the relief sought by Guerra would have multiple collateral impacts hindering or interfering with the PUC's exercise of authority, within the meaning *Covalt's* third criteria, because it would create a subcategory of rate-payers entitled to enhanced protections (e.g. persons living in residences where SDG&E facilities share a keyed entrance to common areas) without defining a uniform standard of care applicable throughout the state, and the costs of the enhanced security measures could be borne by all ratepayers rather than only those ratepayers benefitted by the enhanced security. Because only the PUC is empowered to establish rules and fix rates for SDG&E customers, the relief sought would hinder or interfere with the PUC's exercise of authority. However, SDG&E cites no authority suggesting *Covalt's* tripartite test is disjunctive, and therefore the collateral impacts have no relevance where (as here) the second part of *Covalt* is not satisfied. Moreover, SDG&E's claim a ruling in Guerra's favor would impact rates, thereby transgressing on the PUC's exclusive authority over rates, appears contrary to established law. In an analogous context, a court rejected an argument that a court could not invalidate the early termination fees (ETF's) charged by cell phone providers because rate regulation of those providers was preempted, stating " '[a] judicial act constitutes rate regulation only if its principal purpose and direct effect

16

are to control rates' " (*Cellphone Termination Fee Cases* (2011) 193 Cal.App.4th 298, 320), and concluding "[i]nvalidation of the ETF's under California's consumer protection laws will have only an indirect and incidental effect on Sprint's rates and, therefore, is not preempted . . . ." (*Id*. at p. 321.) We conclude the limited relief sought by Guerra is not barred by section 1759 as construed in *Covalt*, and therefore the trial court erred when it dismissed Guerra's complaint under section 1759.

B. <u>SDG&E's Alternative Arguments to Support the Judgment are Unpersuasive</u>

In the proceedings below, SDG&E also asserted the court should grant judgment on the pleadings based on judicial abstention and because any injury suffered by Guerra resulted from intervening criminal conduct. SDG&E resurrects those arguments on appeal.[3]

*The Abstention Claim*

SDG&E's abstention argument asserts that, when considering relief under the UCL, courts have the discretion to abstain from employing the equitable remedies available under the UCL, namely injunctions and restitution, and "[w]here a UCL action would drag a court of equity into an area of complex economic policy, equitable abstention is appropriate. In such cases, it is primarily a legislative and not a judicial

---

[3] SDG&E also argues, apparently for the first time on appeal, that the motion for judgment on the pleadings was properly granted because the complaint failed to state a claim for relief under the UCL. We ordinarily decline to consider arguments not raised at trial (see generally *Lambert v. Carneghi* (2008) 158 Cal.App.4th 1120, 1129), and we decline to do so here because the failure to raise the argument below at a minimum deprived Guerra of the opportunity to propose amendments that may have cured any purported defect.

function to determine the best economic policy."  (*Desert Healthcare Dist. v. PacifiCare FHP, Inc.* (2001) 94 Cal.App.4th 781, 795.)  SDG&E cites *Alvarado v. Selma Convalescent Hospital* (2007) 153 Cal.App.4th 1292 in support of its argument in favor of abstention.  *Alvarado* involved a class action lawsuit, brought under the UCL, seeking restitution and injunctive relief to require owners and operators of skilled nursing and intermediate care facilities to comply with certain minimum nursing hour requirements, and the trial court sustained a demurrer to the complaint based on abstention.  The appellate court affirmed because "[a]djudicating this class action controversy would require the trial court to assume general regulatory powers over the health care industry through the guise of enforcing the UCL, a task for which the courts are not well-equipped."  (*Id*. at pp. 1303-1304.)  SDG&E asserts that, because Guerra's action would require a court "to assume the function of the PUC and/or would interfere with the PUC's regulatory authority" by imposing security requirements for guarding access to Keyways, "[j]udicial abstention is appropriate [because] granting the requested relief would require a trial court to assume the functions of an administrative agency, or to interfere with the functions of an administrative agency."  (*Id*. at p. 1298.)

SDG&E's argument appears to be a repackaging of its argument under *Covalt* and our reasons for rejecting SDG&E's *Covalt* argument apply with equal force to its abstention claim.  Moreover, the decision in *Alvarado* applied abstention to a milieu bearing little resemblance to the present case.  In *Alvarado,* the lawsuit sought an injunction requiring the owners and operators of nursing facilities to comply with statutory requirements for nursing hours.  However, the statute contemplated the

18

Department of Health Care Services would be charged with adopting regulations setting forth the minimum number of nursing hours per patient required at these facilities (*Alvarado v. Selma Convalescent Hospital, supra,* 153 Cal.App.4th at p. 1303), as well as determining compliance with those regulations by considering which professionals' time would be counted and whether exceptions were applicable. (*Id*. at pp. 1304-1306.) The *Alvarado* court, noting "[t]he DHCS has the power, expertise and statutory mandate to regulate and enforce section 1275.6" (*id*. at p. 1306), concluded the trial court did not abuse its discretion by applying the abstention doctrine because it involved "a task better accomplished by an administrative agency than by trial courts." (*Ibid*.)

The present case does not involve enforcing compliance with a complex statutory scheme, and does not implicate a legislative scheme that contemplated an administrative agency would promulgate implementing regulations and undertake enforcement tasks peculiarly suited to the expertise of the administrative agency. Instead, Guerra's UCL claim alleged SDG&E violated the requirement, set forth in section 451, that SDG&E "furnish and maintain such adequate . . . and reasonable service, instrumentalities, equipment, and facilities . . . as are necessary to promote the safety . . . of its patrons . . . ." The doctrine of judicial abstention does not prevent courts from adjudicating a claim under the UCL evaluating whether a defendant's conduct violates a statutory command, and to issue injunctive relief requiring compliance with those obligations (see *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 500 ["courts routinely are called upon to decide whether an alleged business practice

19

is made unlawful by an underlying statute"]), even though an administrative agency could have parallel jurisdiction over the dispute. (*Id.* at pp. 500-502.)

*The Intervening Criminal Conduct Claim*

SDG&E also argues the claim raised in Guerra's complaint is barred because of intervening criminal conduct, and therefore the motion for judgment on the pleadings was properly granted. The harm suffered by Guerra was the direct result of third persons committing crimes. " 'An intervening force is one which actively operates in producing harm to another after the actor's negligent act or omission has been committed.' [Citation.] Whether it prevents an actor's antecedent negligence from being a legal cause of harm to another is determined by other rules [citation], chiefly those governing the related concept of superseding cause. [¶] 'A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.' [Citation.] If the cause is superseding, it relieves the actor from liability whether or not that person's negligence was a substantial factor in bringing about the harm." (*Brewer v. Teano* (1995) 40 Cal.App.4th 1024, 1030-1031.)

SDG&E's reliance on this doctrine is unpersuasive, for two reasons. First, "[i]t is . . . clear that intervening criminal conduct cannot absolve the defendant of liability where as here the plaintiff alleges that defendants maintained the property in such a way so as to increase the risk of criminal activity." (*Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 812; accord, *Kwaitkowski v. Superior Trading Co.* (1981) 123 Cal.App.3d 324, 333 [rejecting intervening criminal conduct as superseding

20

cause where alleged negligence was inadequate lock, noting "a properly functioning front door lock is a vital first line of defense"].)  Guerra's claim here is that SDG&E's failure to safeguard the keys was the precise conduct increasing the risk of criminal conduct. Second, SDG&E cites no authority suggesting the intervening criminal conduct doctrine can be applied at the pleading stage, and analogous law appears to be to the contrary. (See *Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 18-19 [third party conduct may be viewed as a superseding cause "when it is so highly extraordinary as to be unforeseeable" but "foreseeability is a question for the jury unless undisputed facts leave no room for a reasonable difference of opinion.  [Citations.]  Thus, the issue of superseding cause is generally one of fact."].)

C. Conclusion

We conclude the trial court erred in granting SDG&E's motion for judgment on the pleadings without leave to amend.

DISPOSITION

The judgment is reversed.  Guerra is entitled to costs on appeal.


McDONALD, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.

21