Filed 4/29/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PEGASTAFF,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>CALIFORNIA PUBLIC UTILITIES<br>COMMISSION,<br><br>        Defendant and Respondent. | A139732<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-09-492995) |

PegaStaff is an agency that provides temporary staffing for its clients. A large part of PegaStaff's business was the provision of staffing to Pacific Gas & Electric (PG&E), through a staffing agency with which PG&E directly contracted, initially Corestaff Services, LP (Corestaff) and later Agile 1.

The California Public Utilities Commission (CPUC) adopted General Order 156 to implement Public Utilities Code[1] sections 8281 through 8286 (Article 5),[2] the purpose of which is to encourage and develop the use of women, minority and disabled veteran-owned business enterprises (WMDVBEs) within the public utility sector. PegaStaff is not a WMDVBE and after PG&E adopted a program to increase the utilization of WMDVBEs, its provision of staff to PG&E was substantially reduced.

---

[1] Unless otherwise indicated, further statutory citations are to the Public Utilities Code.

[2] Sections 8281 through 8286 comprise article 5 of chapter 7 of the Public Utilities Code.

1

PegaStaff filed suit against the CPUC, PG&E, Corestaff and Agile 1. Its claims against the CPUC consisted of constitutional challenges to Article 5 and General Order 156. The trial court determined that it did not have subject matter jurisdiction to consider PegaStaff's constitutional challenges, granted the CPUC's motion for judgment on the pleadings, and entered judgment in favor of the CPUC. The trial court also denied PegaStaff's motion to transfer its claims against the CPUC to the Court of Appeal.

On appeal,[3] PegaStaff maintains that the trial court has subject matter jurisdiction to hear its claims against the CPUC. PegaStaff also argues that if the trial court did not err on the jurisdictional issue, then it erred by denying the motion to transfer. We find no merit in PegaStaff's arguments and affirm.

## BACKGROUND[4]

The CPUC is an agency created by the California Constitution to regulate privately owned public utilities such as PG&E. (Cal. Const., art. XII.)

PegaStaff is a division of PegaSoft Corporation, a California corporation, that provides temporary staffing in the fields of information technology and engineering. Mark Arshinkoff, a white male, owns 100 percent of PegaSoft stock.

For nine years prior to filing suit, PegaStaff provided contract labor to PG&E through a program administered by Corestaff, another staffing company. PegaStaff's placement of workers at PG&E peaked in 2007 at about 40 workers. In that year, PegaStaff received about 400 job orders and revenue of about $4.5 million from PG&E. The revenue from PG&E comprised about 50 percent of PegaStaff's gross revenues for the year.

In October 2007, at the direction of PG&E, Corestaff created a tier structure whereby all WMDVBEs were placed in the first tier and all other businesses, such as

---

[3] PegaStaff's claims against PG&E, Corestaff and Agile 1 are not at issue in this appeal.

[4] Because this appeal is from a judgment on the pleadings, we state facts concerning PegaStaff and its transactions with the defendants as alleged in the complaint. (*DiPirro v. American Isuzu Motors, Inc.* (2004) 119 Cal.App.4th 966, 972.)

2

PegaStaff, were placed in the second tier. First tier businesses received preference in job orders for temporary workers. Corestaff created the tiered system because its contract with PG&E required it to spend a substantial percentage of its purchasing/contracting dollars on WMDVBEs.

The number of PG&E job orders routed to PegaStaff dropped substantially as a consequence of the tier structure. Many contingent workers placed by PegaStaff were transferred to WMDVBEs by Corestaff, to PegaStaff's financial detriment. Between January and September 2009, PegaStaff received only one job order for PG&E from Corestaff and employed only four temporary workers at PG&E. In 2010, defendant Agile 1 replaced Corestaff as the administrator of PG&E's contingent worker program.

On September 29, 2009, PegaStaff filed suit. The operative first amended complaint (FAC) was filed on September 5, 2012, naming PG&E, Corestaff, Agile 1 and the CPUC as defendants. The FAC asserts 10 causes of action: (1) violation of Civil Code section 51.5 (barring discrimination by businesses based on enumerated characteristics), asserted against Corestaff and PG&E; (2) violation of California Constitution, article I, section 31 (barring discrimination by the state based on race, sex, color, ethnicity or national origin in the operation of public employment, public education or public contracting), asserted against the CPUC; (3) violation of the equal protection clause of the California Constitution (Cal. Const., art. I, § 7), asserted against the CPUC; (4) injunctive relief for violation of California's unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), asserted against Corestaff and PG&E; (5) intentional interference with prospective economic advantage, asserted against PG&E; (6) negligent interference with prospective economic advantage, asserted against PG&E; (7) civil conspiracy, asserted against Agile 1; (8) intentional interference with prospective economic advantage, asserted against Agile 1; (9) negligent interference with prospective economic advantage, asserted against Agile 1; and (10) violation of the UCL, asserted against Agile 1. PegaStaff sought, among other relief, a declaration that Article 5 and General Order 156 are "unconstitutional, invalid, unenforceable and void, both on their face and as applied here."

3

On May 13, 2013, the CPUC filed a motion for judgment on the pleadings, asserting that section 1759 deprives the superior court of subject matter jurisdiction over PegaStaff's two claims asserted against it. PegaStaff opposed CPUC's motion but eight days before the hearing set for that motion moved for transfer to this court, should the trial court determine that it lacked jurisdiction.

A hearing on the parties' motions, as well as other matters, was held on July 11, 2013. At the hearing, the trial court stated that the CPUC's motion for judgment on the pleadings would be granted. The court also denied as untimely PegaStaff's motion to transfer. On July 15, 2013, the court filed an order formally making the rulings that it stated at the hearing. It granted the motion based on section 1759, concluding that it "lacks jurisdiction to review constitutional challenges to Sections 8281-8286 because it would interfere with Defendant CPUC's job duties" and lacks jurisdiction to hear constitutional challenges to General Order 156 because it "lacks jurisdiction to review, reverse, correct, or annul any order or decision of the commission."

The court entered judgment in favor of the CPUC on July 15, 2013. PegaStaff timely filed a notice of appeal on September 11, 2013.

## DISCUSSION

The primary issue in this appeal is whether the trial court has subject matter jurisdiction over PegaStaff's constitutional claims against the CPUC. We conclude that the court correctly determined that it lacks jurisdiction.

Also at issue is whether the trial court erred in denying PegaStaff's motion to transfer to this court. We conclude that there was no error because the trial court did not abuse its discretion.

### I. *The Superior Court Correctly Held That It Lacked Jurisdiction Over PegaStaff's Claims Against The CPUC.*

We review a trial court's ruling on a motion for judgment on the pleadings de novo. (*Smiley v. Citibank* (1995) 11 Cal.4th 138, 145-146.) We treat as true " 'all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law.' " (*DiPirro v. American Isuzu Motors, Inc.*, *supra,* 119 Cal.App.4th at p. 972.)

4

Further, "[w]hether the superior court has subject matter jurisdiction over an action . . . [against] the [CPUC] is a question of law we independently review." *Disenhouse v. Peevey* (2014) 226 Cal.App.4th 1096, 1102.

## A. *The Constitution, The CPUC And The Legislative Scheme*

The California Constitution establishes the CPUC and charges it with certain functions. (Cal. Const., art. XII, §§ 1-8.) As relevant here, the Constitution provides that the CPUC "may fix rates, establish rates, examine records, issue subpenas, administer oaths, take testimony, punish for contempt, and prescribe a uniform system of accounts for all public utilities subject to its jurisdiction." (*Id.*, § 6.) It also provides that "[s]ubject to statute and due process, the [CPUC] may establish its own procedures." (*Id.*, § 2.)

The Constitution also provides that public utility companies[5] are "subject to control by the Legislature." (Cal. Const., art. XII, § 3.) Further, it confers on the Legislature "plenary power, unlimited by the other provisions in this constitution but consistent with this article, to confer additional authority and jurisdiction upon the [CPUC and] to establish the manner and scope of review of commission action in a court of record . . . ." (*Id.*, § 5.)

The Legislature used this power to enact the Public Utilities Act (§ 201 et seq.) and many other statutes comprising the Public Utilities Code, including section 701, which confers expansive authority on the CPUC: "The commission may supervise and regulate every public utility in the State and may do all things, whether specifically designated in [the Public Utilities Act] or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." The Public Utilities Code also includes Article 5, encouraging the procurement of goods and services by public

---

[5] The Constitution defines as public utilities "[p]rivate corporations and persons that own, operate, control, or manage a line, plant, or system for the transportation of people or property, the transmission of telephone and telegraph messages, or the production, generation, transmission or furnishing of heat, light, water, power, storage or wharfage directly or indirectly to or for the public, and common carriers . . . ." (Cal. Const., art. XII, § 3.)

utilities and their contractors from WMDVBEs. Article 5 declares as state policy "to aid the interests of [WMDVBEs] in order to preserve reasonable and just prices and a free competitive enterprise, to ensure that a fair proportion of the total purchases and contracts or subcontracts for commodities, supplies, technology, property, and services for regulated public utilities, including, but not limited to, renewable energy, wireless telecommunications, broadband, smart grid, and rail projects, are awarded to [WMDVBEs], and to maintain and strengthen the overall economy of the state." (§ 8281, subd. (a).)

In furtherance of that policy, Article 5 authorizes and directs the CPUC to: (1) require utilities to submit an annual, detailed and verifiable plan for increasing procurement from WMDVBEs (§ 8283, subd. (a)); (2) provide guidelines for utilities to use in establishing programs pursuant to Article 5 (§ 8283, subd. (c)); (3) "recommend a program for carrying out the policy" of Article 5 (§ 8283, subd. (e)(1)); and (4) file an annual report with the Legislature on the progress of activities undertaken by utilities in the implementation of such programs (§ 8283, subd. (e)(1)). Article 5 also directs that the utilities' annual plans "shall include short- and long-term goals and timetables, but not quotas, and shall include methods for encouraging both prime contractors and grantees to engage [WMDVBEs] in subcontracts in all categories that provide subcontracting opportunities . . . ." (§ 8283, subd. (b).)

In 1988, the CPUC issued Decision 88-04-057, in which it adopted an interim order, which later became General Order 156,[6] to implement Article 5. (*Re Public Utilities Code Sections 8281 to 8285 Relating to Women and Minority Business Enterprises*, Decision No. 88-04-057 (1988) 28 Cal.P.U.C.2d 36.) Prior to adopting the interim order, the CPUC conducted rulemaking proceedings in which 17 utilities participated. (*Id.* at p. 40.)

---

[6] General Order 156 is available at <http://docs.cpuc.ca.gov/PublishedDocs/PUBLISHED/GRAPHICS/171157.PDF>.

The CPUC has conducted further rulemaking proceedings since 1988 to consider and adopt modifications to General Order 156, most recently in 1998, 2003, 2005, 2006, and 2011. (General Order 156, p. 1; see *Re Rulemaking to Revise General Order 156*, Decision No. 98-11-030 (1998) 83 Cal.P.U.C.2d 57; *Decision Amending General Order 156 and Calling for Workshops*, Decision No. 03-11-024 (Cal.P.U.C., Nov. 13, 2003) <http://docs.cpuc.ca.gov/PublishedDocs/WORD_PDF/FINAL_DECISION/31751.PDF>; *Order Amending General Order 156 to Achieve Greater Reporting Uniformity*, Decision No. 05-12-023 (Cal.P.U.C., Dec. 15, 2005) <http://docs.cpuc.ca.gov/ PublishedDocs/WORD_PDF/FINAL_DECISION/52095.PDF>; *Order Instituting Rulemaking for the Purpose of Amending General Order 156*, Decision No. 06-08-031 (Cal.P.U.C., Aug. 24, 2006) [2006 Cal. PUC LEXIS 299]; *Order Instituting Rulemaking for the Purpose of Reviewing and Potentially Amending General Order 156 etc.*, Decision No. 11-05-019 (Cal.P.U.C., May 5, 2011) 289 P.U.R.4th 112 [2011 Cal. PUC LEXIS 276].) Notably, in a 1996 proceeding it considered and adopted amendments proposed pursuant to a settlement with an individual who sued the CPUC in U.S. District Court challenging the constitutionality of the Commission's WMDVBE Program. (See *Re Rulemaking to Revise General Order 156*, Decision No. 96-04-018 (1996) 65 Cal.P.U.C.2d 265, 267; *Re Rulemaking to Revise General Order 156*, Decision No. 98-11-030 (1998) 83 Cal.P.U.C.2d 57, 58, 70, fn.1 [discussing Decision 96-04-018 and *Bras v. Cal.P.U.C.,* Case No. 92-0304-WHO]; see also *Bras v. CPUC* (9th Cir. 1995) 59 F.3d 869.)

General Order 156 includes a section on goals for increasing the engagement of WMVDBEs in subcontracting opportunities. (General Order 156, § 8, pp. 16-19.) The goals section specifies minimum long-term goals that utilities must set in their plans. (*Id.*, § 8.2, pp. 16-17.)

**B. *The Limits On Jurisdiction Over Cases Involving The CPUC***

Superior courts are courts of general jurisdiction, and generally have the authority to determine the constitutionality of statutes. (Cal. Const., art. VI, § 10; *Rescue Army v. Municipal Court of City of Los Angeles* (1946) 28 Cal.2d 460, 464.) However, pursuant

7

to its plenary authority under article XII, section 5 of the state Constitution "to establish the manner and scope of review of commission action in a court of record," the Legislature has explicitly restricted the jurisdiction of the superior court in cases involving the CPUC: "No court of this state, except the Supreme Court and the court of appeal, to the extent specified in this article, shall have jurisdiction to review, reverse, correct, or annul any order or decision of the commission or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the commission in the performance of its official duties, as provided by law and the rules of court." (§ 1759)

PegaStaff's two claims asserted against the CPUC challenge Article 5 and General Order 156 on California constitutional grounds, and PegaStaff seeks a declaration that they are unconstitutional and unenforceable. The trial court determined that under section 1759 it was without jurisdiction as to the challenge to Article 5 because to declare it unconstitutional would be to interfere with the CPUC in the performance of its official duties. The trial court also determined that under section 1759 it was without jurisdiction as to the challenge to General Order 156 because to declare it unconstitutional would be to annul an order of the CPUC.

PegaStaff contends that the court erred as to both jurisdictional findings, arguing that the CPUC's "official duties" are not implicated in its causes of action and that section 1759 does not address original claims for relief from the effects of General Order 156. We disagree.

### 1. *The Superior Court Lacked Jurisdiction Over PegaStaff's Challenge To Article 5.*

The first question we consider is whether a declaration that Article 5 is unconstitutional would "interfere with the [CPUC] in the performance of its official duties" within the meaning of section 1759. PegaStaff's arguments are confusing, at best. Its first argument is that Article 5 does not expressly confer on the CPUC the power to set goals for utilities procurement from WMDVBEs, and that setting and enforcing such goals are not, therefore, part of the CPUC's official duties. From this premise, a decision

8

on the constitutionality of Article 5 will not interfere with any such official duties. It further argues that if Article 5 is unconstitutional, then "the CPUC has no valid 'official duties' under [those provisions] with which the superior court could interfere." It contends, citing *BNSF Railway Co. v. Public Utilities Com.* (2013) 218 Cal.App.4th 778 (*BNSF Railway*), that setting WMDVBE procurement goals cannot be part of the CPUC's official duties because such goals are not "cognate and germane to the regulation of public utilities." Finally, PegaStaff urges us to construe section 1759 to exclude constitutional challenges to statutes and CPUC regulations because the CPUC itself cannot resolve such challenges.[7]

The first argument is entirely off the mark because it focuses on the validity of General Order 156, and not on the effect of the declaratory and injunctive relief PegaStaff seeks as to Article 5 itself. PegaStaff specifically requested a declaration that the provisions of Article 5 themselves are unconstitutional and an injunction against their enforcement. PegaStaff concedes that the CPUC's official duties are those set forth in the Constitution and statutes. If the superior court had held that Article 5 was unconstitutional, that would interfere with the CPUC's duties under that statute. Whether or not the General Order is authorized by Article 5 or constitutes a part of the CPUC's "official duties" is beside the point in deciding whether there is jurisdiction to consider the challenge to Article 5.

PegaStaff's further argument—that if Article 5 is unconstitutional it does not confer "valid duties" with which a superior court ruling could interfere—turns the jurisdictional statute on its head. PegaStaff's interpretation of "official duties" would require the superior court to decide the merits of PegaStaff's challenge in order to decide whether it has jurisdiction to rule on that very challenge. Section 1759 denies jurisdiction to "review" or "reverse" CPUC orders and decisions and to "enjoin, restrain, or interfere" with the CPUC's "performance of its official duties." PegaStaff's argument that the

---

[7] PegaStaff raises this final argument with respect to its challenge to General Order 156 as well as to its challenge to Article 5. We address the argument in discussing the challenge to Article 5, but it applies equally to the General Order 156 challenge.

9

superior courts are free to hold CPUC-related statutes, orders and decisions invalid would entirely undermine section 1759's fundamental purpose of limiting judicial review over challenges to CPUC orders and actions so as to "expedite the[ir] final operative effect." (*County of Sonoma v. State Energy Resources Conservation etc. Com.* (1985) 40 Cal.3d 361, 368 [in "channeling judicial review of PUC decisions" to Supreme Court [and later Court of Appeal], "the Legislature sought to expedite the final operative effect of those decisions"]; see *Sexton v. Atchison T. & S.F.R. Co.* (1916) 173 Cal. 760, 764 (*Sexton*) ["The clear intent of the provision as a whole is to place the commission, in so far as the state courts are concerned, in a position where it may not be hampered in the performance of any official act by any court, except to the extent and in the manner specified in the act itself"]; *Disenhouse v. Peevey*, *supra*, 226 Cal.App.4th at p. 1102 [referring to "Legislature's aims in placing limits on judicial review of commission actions"].)

Nor can PegaStaff's interpretation of "official duties" be squared with the language of section 1759. The statute refers to "official duties, as provided by law and the rules of court," making plain that a duty set forth in law *is* an official duty. Nothing about that language suggests that a law must first be found constitutional or otherwise valid in order to be a source of the CPUC's "official duties." So long as a law was validly enacted by the Legislature, any duties such statute imposes on the CPUC are "official duties" within the meaning of section 1759, and the superior courts lack jurisdiction to interfere with the duties it imposes.

The California Supreme Court held precisely that a century ago in *Sexton*. In that case, the plaintiff, a railroad shareholder, sought to challenge section 11 of the Public Utilities Act, which allowed commission[8] members and employees to ride any railroad for free when in the performance of their duties. (*Sexton*, *supra*, 173 Cal. at pp. 760-62.) Plaintiff contended that the section deprived the railroad of property without due process in violation of the federal and state constitutions. (*Id*. at p. 762) The superior court

---

[8] The "commission" in *Sexton* was the Railroad Commission, the predecessor of the CPUC. (*Independent Energy Producers Assn. v. McPherson* (2006) 38 Cal.4th 1020, 1037.)

sustained demurrers to the complaint for lack of jurisdiction under section 67 (predecessor to section 1759), and the California Supreme Court affirmed. (*Id*. at p. 765.) The plaintiff in *Sexton* made the same arguments PegaStaff asserts here—"that there can be no *official duty*, within the meaning of that term as used in the section, to enforce a provision of the act that is in violation of a constitutional provision, . . . and that it was not the design of the section to interfere, in any way, with the jurisdiction of the superior court to inquire as to the validity of any provision of the act, and to prevent by injunction the attempted enforcement by the commission of the provision if it found it to be invalid." (*Id*. at p. 763.) The Court gave short shrift to these arguments: "The first of these [arguments] is not very earnestly pressed, and of course could not be in view of the language of the section. The matter of orders and decisions of the commission is dealt with in the first portion of the provision, while the latter portion, in language that cannot be read otherwise, prevents any such interference as is therein declared with any official duty of the commission. We are satisfied that the second claim is equally untenable. The plain design of the provision was to prevent any interference with the commission by the courts, except as prescribed in the act itself, in the performance of any duty defined by the act. The term 'official duties' as used therein cannot reasonably be given any other meaning, especially when considered in connection with the first portion of the provision, as it must be." (*Id.* at pp. 763-764.)

PegaStaff suggests that "the law has significantly changed since *Sexton*." But any doubt about the continued vitality of that decision is put to rest by Justice Baxter's opinion, writing for the unanimous court, in *Greener v. Workers' Comp. Appeals Bd*. (1993) 6 Cal.4th 1028 (*Greener*). That case involved a constitutional challenge to a then new provision of the Labor Code terminating the power of the Workers' Compensation Appeals Board to award attorneys' fees to representatives of applicants who were not licensed attorneys. (*Id.* at p. 1033.) Unlicensed representatives sued for declaratory relief to invalidate the statute on equal protection and other constitutional grounds. (*Ibid*.) Interpreting a workers' compensation jurisdictional statute (Labor Code section 5955) that was "modeled after, and almost identical to section 67 of the Public

11

Utilities Act [current section 1759]" (*id.* at p. 1041), the Supreme Court held that the superior court lacked jurisdiction to address a challenge to the constitutionality of the workers' compensation statute. (*Id.* at p. 1044.) The Court of Appeal had held the opposite, accepting an argument similar to that made by the plaintiff in *Sexton* and by PegaStaff in this case: "that the action did not challenge an order of the Board, and did not ask the superior court to interfere with the duties of the Board, since the Board had no duty to act under an invalid statute." (*Id.* at p. 1034.)

The Supreme Court reversed, observing that in *Sexton* it had "rejected" the arguments on which the Court of Appeal relied: "that the jurisdictional limitations of section 67 of the Public Utilities Act applied only to review of orders of the commission" and "that granting the requested injunction against [enforcement of the statute] would not interfere with the commission's performance of its duties because the commission had no duty to comply with an invalid statute." (*Greener*, *supra*, 6 Cal.4th at pp. 1041-42.) The court concluded, as in *Sexton*, that "were the relief sought by plaintiffs granted, the effect of the superior court judgment would be to interfere with the Board in carrying out the duty imposed on it by the [challenged] statutes . . . ." (*Id.* at 1042.)

There is nothing about PegaStaff's constitutional challenge to Article 5 that is materially distinguishable from *Sexton* and *Greener*.[9] Nor is there any merit to PegaStaff's argument, quoting *BNSF Railway*, *supra*, 218 Cal.App.3d at page 784, that

---

[9] PegaStaff attempts to distinguish *Greener* because "unlike this situation under the Public Utilities Code, the *Greener* plaintiffs' claims were premature because the agency had not yet acted in a manner so as to violate their alleged rights." PegaStaff has not materially distinguished *Greener*, which stated: "If the Legislature intended by [Labor Code section 5955] to limit jurisdiction over challenges to the validity of the workers' compensation law to claims made in a petition for review of an order or decision of the Board, plaintiffs' challenge was premature. When this action was instituted, the statute in question had not become effective and plaintiffs had not been denied a lien on an applicant's award." (*Greener*, *supra*, 6 Cal.4th at p. 1040.) Following this observation, the Court then went on to consider the matter of subject matter jurisdiction without reference to whether the plaintiffs' claims might be premature. (*Id.* at pp. 1041-1045.) The possible prematurity of the plaintiffs' claims neither affected the Court's analysis nor limited its holding.

12

"[w]hile the powers of the CPUC include under [s]ection 701 . . . to 'do all things . . . which are necessary and convenient in the exercise of [its] power and jurisdiction[,]' . . . those powers are not unbounded" and that additional powers and jurisdiction that the commission exercises " 'must be cognate and germane to the regulation of public utilities.' " As PegaStaff would have it, the CPUC's adoption and enforcement of WMDVE goals for utilities' procurement contracts is not cognate or germane to the regulation of public utilities and thus not encompassed within the "official duties" addressed by section 1759. PegaStaff again ignores that "official duties" are the duties set forth in law. The Legislature obviously viewed the goal of encouraging utilities' increased use of WMDVBEs for procurement as "cognate" and "germane" to the regulation of utilities when it enacted Article 5.[10] If encouraging such procurement is cognate and germane, then that is so regardless of the method by which that objective is accomplished (by goals or other mechanisms—so long as quotas, prohibited by Article 5, are not employed). To the extent PegaStaff contends that the CPUC acted beyond the legislative authority conferred by Article 5, that is irrelevant to whether there is jurisdiction over its challenge to Article 5 itself, as we have already stated. To the extent it is arguing that the *Legislature* acted beyond its constitutional authority in enacting Article 5, the argument fails for the same reason as its argument that Article 5 is unconstitutional and cannot confer any valid duty. "Official duties" encompass all duties imposed by law on the CPUC, and the superior court lacks jurisdiction to interfere with such duties on constitutional or any other grounds.

*BNSF Railway* does not hold otherwise. The court there held simply that the " 'additional' " and unspecified but broad supervisory and regulatory powers the Legislature conferred on the CPUC under section 701 were limited to powers that are

---

**10** The CPUC has imposed other contracting requirements on regulated utilities, suggesting the scope of the CPUC's authority over utilities is sufficiently broad to include contracting. (See *Southern California Edison Co. v. Public Utilities Com.* (2006) 140 Cal.App.4th 1085, 1091 [finding procedural violation in CPUC's adoption of requirement that public utilities require payment of prevailing wages to workers on energy utility construction projects].)

13

" ' "cognate and germane to the regulation of public utilities." ' " (*BNSF Railway*, 218 Cal.App.4th at p. 784.) The issue was whether those additional unspecified powers were broad enough to allow the CPUC to issue an order that *contravened* a specific state statute. (*Id.* at p. 785.) Our sister court held they were not. (*Id.* at p. 798.) Unlike the CPUC directive in that case, which was in direct conflict with the legislation, the question here concerns a challenge to the legislation itself.[11] The Legislature plainly concluded that encouraging procurement contracts with WMDVBEs was germane to utility regulation. PegaStaff's argument that the CPUC's efforts to comply with that statute are *not* ignores the Legislature's determination and finds no support in *BNSF Railway*.

Last, contrary to PegaStaff's final argument, the fact that the CPUC could not decline to enforce a statute duly enacted by the Legislature on the ground that it violates the state or federal Constitution does not require an interpretation of section 1759 that exempts such challenges from its limitation on superior court jurisdiction. PegaStaff contends that article III, section 3.5[12] of the California Constitution prevents the CPUC from declaring a statute unconstitutional or refusing to enforce it because it is unconstitutional absent an appellate court decision so holding. As PegaStaff notes, the voters amended the California Constitution with article III, section 3.5 in response to a California Supreme Court decision holding that the CPUC did have the power to declare statutes unconstitutional. (See *Lockyer v. City and County of San Francisco* (2005) 33 Cal.4th 1055, 1087, citing *Southern Pac. Transportation Co. v. Public Utilities Com.* (1976) 18 Cal.3d 308.)

The general rule is that a plaintiff must first exhaust administrative remedies before seeking a judicial remedy. (*Sheet Metal Workers Internat. Assn., Local Union No. 104 v. Rea* (2007) 153 Cal.App.4th 1071, 1085 ["failure to exhaust administrative remedies usually precludes a judicial action"].) Here, PegaStaff could have sought a

---

[11] PegaStaff also challenges General Order 156, as we discuss below. But it discusses *BNSF Railway* in the context of its challenge to Article 5.

[12] PegaStaff refers to the constitutional provision as article I, section 3.5, but this is a miscitation. The provision it quotes is article III, section 3.5.

14

remedy from the CPUC. (See § 1702 ["Complaint may be made [to the CPUC] . . . by any corporation or person . . . by written petition or complaint, setting forth any act or thing done or omitted to be done by any public utility, including any rule or charge heretofore established or fixed by or for any public utility, in violation or claimed to be in violation, of any provision of law or of any order or rule of the [CPUC]"]; § 1708.5 [the CPUC "shall permit interested persons to petition the commission to adopt, amend, or repeal a regulation"].)

Even if PegaStaff could not have obtained all of the relief it seeks at the administrative level, it "would still be required to exhaust administrative remedies prior to making the constitutional challenge." (*Leek v. Washington Unified School Dist.* (1981) 124 Cal.App.3d 43, 52; *Mountain View Chamber of Commerce v. City of Mountain View* (1978) 77 Cal.App.3d 82, 94-95 [exhaustion of the administrative remedy does not foreclose appellants from raising the constitutional arguments in a subsequent judicial proceeding]; *Morton v. Superior Court* (1970) 9 Cal.App.3d 977, 984 ["the rule that the exhaustion doctrine is inapplicable when constitutional . . . issues . . . are raised . . . is not followed in California"].)[13] PegaStaff could conceivably have obtained some relief from

---

[13] *Leek* was decided after the voters enacted article III, section 3.5, and the court there rejected the argument that the inability of the Personnel Employment Relations Board (PERB) to declare unconstitutional or decline to enforce a statute plaintiffs challenged did not excuse plaintiffs from exhausting their administrative remedy, reasoning that a ruling by PERB on nonconstitutional issues could obviate the need for a court to reach the constitutional challenge. (*Leek v. Washington Unified School Dist.*, *supra*, 124 Cal.App.3d at pp. 53-54.) In *Link v. Antioch Unified School District* (1983) 142 Cal.App.3d 765, 768-69, this court required exhaustion even where all of plaintiffs' claims were styled as constitutional challenges, reasoning that PERB "might validly devise a method to allow plaintiffs to avoid payment for those political and ideological activities they find constitutionally objectionable." These cases advance "the venerable jurisprudential principle to avoid constitutional questions where other grounds are available." (*Service Employees Internat. Union, Local 1000 v. Department of Personnel Admin.* (2006) 142 Cal.App.4th 866, 873.) PegaStaff complains that PG&E's program violates the Unruh Act and that PG&E's and other private defendants' conduct violated the unfair competition law and interfered with PegaStaff's prospective economic advantage. Resolution of these claims in PegaStaff's favor could provide it complete relief and obviate the need to reach its constitutional challenges, as could a revision of the

15

the CPUC as apparently an earlier challenger did in 1996. (See *Re Rulemaking to Revise General Order 156*, Decision No. 96-04-018 (1996) 65 Cal.P.U.C.2d 265.) It could have sought a ruling from the CPUC that PG&E, through its requirements on Corestaff and Agile 1, exceeded the mandates of General Order 156 and, in doing so, committed constitutional violations. It could have sought revision of General Order 156, advancing its constitutional concerns. Even though the CPUC could not have determined Article 5 to be unconstitutional, it "still remain[ed] free to *interpret* the existing law in the course of discharging its statutory duties." (*Regents of Univ. of Cal. v. Public Employment Relations Bd.* (1983) 139 Cal.App.3d 1037, 1042.) An administrative agency is not prevented from construing its governing statutes "in light of constitutional standards." (*Cumero v. Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 583.)

Moreover, the Public Utilities Act itself contemplates that constitutional questions may be involved in issues raised before the CPUC and provides for de novo consideration of such issues in the appellate courts. Section 1760 provides: "Notwithstanding Sections 1757 and 1757.1,[14] in any proceeding wherein the validity of any order or decision is challenged on the ground that it violates any right of petitioner under the United States Constitution or the California Constitution, the Supreme Court or Court of Appeal shall exercise independent judgment on the law and the facts, and the findings or conclusions of the [CPUC] material to the determination of the constitutional question shall not be final." The Legislature's provision in section 1760 for full consideration of constitutional issues in the appellate courts means that a party such as PegaStaff who is aggrieved by a statute it contends is unconstitutional has an adequate remedy. It also supports an interpretation of section 1759 as depriving superior courts of jurisdiction even in constitutional cases involving constitutional issues.

---

General Order by the CPUC or an interpretation of that Order or Article 5 in light of constitutional considerations.

[14] Sections 1757 and 1757.1 limit the evidence and scope of review in the Court of Appeal and Supreme Court in connection with petitions for writ review of CPUC decisions. Section 1760 creates an exception for constitutional challenges.

16

For all of the foregoing reasons, we agree with the superior court's holding that it lacks subject matter jurisdiction to consider PegaStaff's constitutional challenge to Article 5.[15]

## 2. *The Superior Court Lacked Jurisdiction Over The Challenge To General Order 156.*

Section 1759 deprives the superior courts of jurisdiction to "review, reverse, correct, or annul any order" of the CPUC. This would seem to settle the question of whether the superior court may adjudicate a constitutional challenge to General Order 156, but PegaStaff argues that section 1759 addresses claims that are "in the nature of appellate review" and "does not address original claims for relief, but only CPUC decisions and orders thereon."

Section 1759 is in article 3 of chapter 9 of the Public Utilities Act. Article 3 addresses judicial review of CPUC decisions or orders after a hearing on a matter is held by the CPUC pursuant to the preceding articles, which address hearings (article 1) and rehearings (article 2). Article 3 provides for judicial review of CPUC decisions or orders by way of petition for a writ of review in the Court of Appeal or the Supreme Court. (§ 1756, subd. (a).) Accordingly, goes PegaStaff's argument, "review" as used in section 1759 refers to actions that are presented as petitions for writ of review in the superior court, and not to original claims for relief that have not been preceded by an administrative hearing by the CPUC: "the 'review,' reversal or annulment to which

---

[15] PegaStaff cites *Koponen v. Pacific Gas & Electric Co.* (2008) 165 Cal.App.4th 345, 350 for the proposition that "the Superior court may properly determine certain rights of litigants without running afoul of Section 1759." *Koponen* involved an allegation that PG&E violated plaintiff's property rights, and PG&E asserted that its actions were taken pursuant to a CPUC grant of authority. (*Id.* at pp. 348, 351.) The *Koponen* court reversed the trial court, which had sustained PG&E's demurrer, after concluding that plaintiff's claims had nothing to do with the CPUC grant of authority and that the CPUC "has no regulatory authority or interest in private disputes over property rights between PG&E and private landowners." (*Id.* at p. 353.) Here, the validity of Article 5 and General Order 156 are central to PegaStaff's claims, materially distinguishing it from *Koponen*, in which the CPUC was not a defendant and the CPUC's enabling statutes were not at issue.

Section 1759 refers is 'writ review' of and relief from an inferior tribunal's decisions following hearing, presentation of evidence—*i.e.*, upon a developed record—and a final decision. " Apart from its description of article 3 and section 1759's place in that article, PegaStaff cites no authority for this interpretation.

PegaStaff's argument focuses on one clause of section 1759, but ignores, the others. Section 1759, to be sure, bars superior court from "review[ing], revers[ing], correct[ing], or annul[ling] any order or decision of the commission or [] suspend[ing] or delay[ing] the execution or operation thereof." One could read that language as referring to a bar against superior courts exercising a function akin to appellate review of quasi-judicial and judicial decisions of the commission—although we note that this would require a narrow interpretation of the word "order" that excludes general orders, such as General Order 156, issued after quasi-legislative hearings. But even if we were to read "order" to mean only orders issued in judicial or quasi-judicial proceedings, section 1759 limits more than review of decisions and orders. It also prevents superior courts from "enjoin[ing], restrain[ing], or interfer[ing] with the commission in the performance of its official duties, as provided by law and the rules of court." The latter language is broad and speaks in terms of enjoining acts of the CPUC itself, not only of reviewing CPUC decisions.

PegaStaff also ignores the case law in which section 1759 has been invoked in suits against utility companies. In such cases, the courts have held section 1759 bars such suits in superior court if they would directly interfere with or undermine policies or regulatory programs of the CPUC. (See, e.g., *People ex rel. Orloff v. Pacific Bell* (2003) 31 Cal.4th 1132, 1144, 1145-48, 1151-56 [and cases cited therein].) Moreover, Division Five of this Court has opined that while superior courts have jurisdiction in original proceedings to enforce CPUC orders, section 1759 prevents them from considering a defense in such a proceeding that the CPUC order is invalid. (*PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1221.) The courts have thus understood section 1759 to preclude any litigation in superior court that would interfere with CPUC

18

policies and programs and not merely litigation that constitutes review of CPUC decisions.

For these reasons, we affirm the superior court's holding that section 1759 deprived it of jurisdiction to consider the constitutionality of General Order 156.

## II. *The Trial Court Did Not Err In Denying PegaStaff's Motion To Transfer.*

On July 3, 2011, PegaStaff served notice of its motion to transfer its claims against the CPUC to the Court of Appeal, specifying July 11, 2011 as the hearing date. At the hearing, the trial court denied the motion because it was not timely made. PegaStaff does not argue that its motion was timely,[16] but instead argues that the court was without discretion to deny its motion because granting it was required by Code of Civil Procedure section 396. We review a trial court ruling on transfer for abuse of discretion. (*Singer v. Superior Court* (1999) 70 Cal.App.4th 1315, 1320.)

The CPUC argues that the issue of PegaStaff's motion to transfer is not properly before us because the issue must be raised via petition for a writ of mandate and not on appeal, citing *Yousafzai v. Hyundai Motor America* (1994) 22 Cal.App.4th 920, 922 ("a writ is the exclusive vehicle for review of such transfer orders"). However, *Yousafzai* observed that "appellate courts occasionally have reviewed transfer questions on appeal," but that such cases "all involve situations where the superior courts eliminated an entire cause of action . . . from the case." (*Id.* at p. 923.) "It is important to note . . . that *Yousafzai* does not hold (or even consider) whether the transfer order would be subject to review on an appeal from the final judgment." (*Ash v. Hertz Corp.* (1997) 53 Cal.App.4th 1107, 1110.) Here, PegaStaff appeals from the final judgment against it as to its claims against the CPUC. Accordingly, we will consider the motion to transfer.

---

[16] Code of Civil Procedure section 1005, subdivision (b), provides that "[u]nless otherwise ordered or specifically provided by law, all moving and supporting papers shall be served and filed at least 16 court days before the hearing" unless the court prescribes a shorter time. PegaStaff served notice of its motion only 8 calendar days before the hearing.

19

Code of Civil Procedure section 396 provides: "(a) No appeal or petition filed in the superior court shall be dismissed solely because the appeal or petition was not filed in the proper state court. [¶] (b) If the superior court lacks jurisdiction of an appeal or petition, and a court of appeal or the Supreme Court would have jurisdiction, the appeal or petition shall be transferred to the court having jurisdiction upon terms as to costs or otherwise as may be just, and proceeded with as if regularly filed in the court having jurisdiction."

Code of Civil Procedure section 396 requires a superior court to transfer an "appeal or petition" to the Court of Appeal or Supreme Court if it lacks jurisdiction to consider the matter itself. Such a transfer does not require a motion by the appellant or petitioner, so the timeliness of such a motion is not relevant. However, even if we ignore the fact that PegaStaff's complaint does not appear to be an "appeal or petition," transfer to this court would have been futile. As we have already noted, PegaStaff was required to first exhaust its administrative remedies and it has not done so. Had the matter been transferred to us, we would have dismissed it for failure to exhaust administrative remedies. Accordingly, we will not find an abuse of discretion by the trial court.

## DISPOSITION

The judgment of the trial court is affirmed.

STEWART, J.

We concur.

KLINE, P.J.

RICHMAN, J.

20

Trial Court:                                    San Francisco City and County Superior Court

Trial Judge:                                  Hon. Richard Kramer

Attorney for Plaintiffs and Appellants:    The Quinlan Law Firm, LLC
William J. Quinlan
Lisa H. Quinlan
Sarah M. Steele

Litigation Law Group
Gordon M. Fauth, Jr.

Attorneys for Defendants and Respondents:    Ruiz & Sperow, LLP
Janice L. Sperow
Forrest F. Fang
Juliana V. Kresse